**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

S. P. DAVIS, SR.                                              CIVIL ACTION NO. 06-0158

VERSUS                                                        JUDGE S. MAURICE HICKS, JR.

UNITED STATES OF AMERICA                    MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 62) filed by the defendant and counterclaimant, the United States of America ("United States"). The United States seeks judgment as a matter of law that plaintiff and counterclaim defendant, S.P. Davis, Sr. ("Davis"), and four additional counterclaim defendants, Willie J. Singleton ("Singleton"), Phillip Pennywell, Jr. ("Pennywell"), James C. Williams ("Williams"), and Samuel W. Stevens ("Stevens"), were persons responsible for the collection and payment of the employment taxes of three corporate entities and willfully failed to make the tax payments such that they are jointly and severally liable. Davis, Singleton, Pennywell, Williams, and Stevens ("the counterclaim defendants") opposed the motion. See Record Documents 72 &74. For the reasons which follow, the Motion for Summary Judgment is **GRANTED**.

**FACTUAL BACKGROUND**

Davis, Singleton, Pennywell, and Williams were equal 25% owners, officers of, and members of the board of Winward Institute, Inc. ("Winward Institute"), doing business as Winward Hospital, Winward Healthcare Center, Inc. ("Winward Healthcare"), and Mynex, Inc. ("Mynex") during the tax quarters at issues for each company from 1996 to 1998. See Record Document 62, Exhibits 22 at 3659-60; 28 at 4095-96; 29 at 4046-47; 57 at 5378;

72 at 13-14. Winward Institute was incorporated in 1995 in Louisiana and provided long-term acute care rehabilitative health services. <u>See id.</u>, Exhibit 44 at 1182; 1 at 1188. By the end of 1997, Winward Institute had expanded from one hospital in Shreveport to five facilities in Louisiana. <u>See id.</u> Its primary income sources were Medicare and Medicaid payments. <u>See id.</u>, Exhibit 44 at 1182. On March 25, 1998, Winward Institute's creditors filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. <u>See id.</u>, Exhibit 74 at 1, 3. The involuntary Chapter 7 proceeding was converted to a voluntary Chapter 11 proceeding on May 22, 1998. <u>See id.</u> at 4. Winward Institute applied to the Bankruptcy Court, and obtained authorization by order entered May 26, 1998, to operate as a debtor-in-possession. <u>See id.</u> at 4, 13-14. Winward Institute continued as a debtor-in-possession until a Chapter 11 trustee was appointed on July 21, 1998. <u>See id.</u> The bankruptcy was converted back to a Chapter 7 proceeding on November 3, 1998, and was terminated on June 26, 2006. <u>See id.</u> at 1, 22.

Winward Healthcare and Mynex were two related, but separately incorporated companies. <u>See id.</u>, Exhibits 70 at 167; 69 at 43-44; 22 at 3660. Winward Healthcare was incorporated in 1995. <u>See id.</u>, Exhibit 5. Mynex was incorporated in Louisiana in 1996. <u>See id.</u>, Exhibit 7 at 1194. Mynex provided management services, pharmaceutical services and product, transportation services, therapy services and marketing services to Winward Hospital and Winward Healthcare Clinic. An involuntary Chapter 7 bankruptcy petition was filed against Mynex on October 2, 1998. <u>See id.</u>, Exhibits 73 at 95; 75 at 1-2. A Chapter 7 trustee was appointed for Mynex on or about November 30, 1998. <u>See id.</u>, Exhibit 75 at 3.

At all relevant times, Stevens, a Certified Public Accountant ("CPA"), served as the

Vice President of Finance.  See id., Exhibits 42, 57, 73.  He was hired in early 1997 by Singleton to serve thereafter as the Vice President of Finance of the three companies.  See id., Exhibits 57, 73.  Stevens reported to James Dan Reid ("Reid"), who served as the Senior Vice President and Chief Operating Officer.  See id., Exhibits 69, 70, 73.  Reid resigned in late 1997[1] and Stevens began reporting directly to the Board.  See id.

Each of the three companies maintained separate checking accounts.  See id., Exhibits 7-14.  The owners had signature authority over the corporate bank accounts of the companies.  See id.  The owners signed checks for all three companies.  See id.  The finance/corporate accounting department prepared the checks for the three companies and the owners supplied the signature.  Typically, the accounting department would prepare the checks made payable to the creditors and two board members would routinely sign the checks.  The owners personally invested hundreds of thousands of dollars during the lives of the companies, including initial investments and periodic capital infusions.  See id., Exhibits 69-72.  All of the owners had the ability to recommend the firing of employees.  See id.

The owners became aware of a federal tax lien in the fall of 1997 when a paralegal in Singleton's and Davis' office read of a tax lien related to one or more of the companies in a local legal publication.  See id., Exhibits 69, 70, 71, 72.  The tax lien was approximately $1 million.  Stevens became aware, sometime prior to September 1997, that the three companies were in arrears with their payroll taxes.  The owners held a meeting, called by

_____

[1]After learning of the tax delinquencies, Davis sought to fire Reid.  See Record Document 62, Exhibit 69 at 36-37.  Davis was overruled by the majority of the Board and Reid was permitted to resign.  See id.

Singleton, after they became aware of the report of the tax lien and instructed Stevens to verify that taxes were due, contact the Internal Revenue Service ("IRS"), find out what actions were appropriate in order to have the taxes paid by the companies and report back to the owners.  See id., Exhibits 69, 70, 71, 72.

Singleton was the Chief Executive Officer, Chairman of the Board, and an owner of the three companies.  See id., Exhibits 6, 70.  He was an attorney with an outside law practice during all relevant time periods.  See id., Exhibit 70.  He contributed at least $300,000 to the companies during the life of the businesses.  See id.  He was aware of operational plans and efforts to reduce costs and generate more cash flow in 1997.  See id.

Davis, an attorney who also had a law practice and served as a Colonel in the United States Army Reserves, was a founder, owner, officer and director of, and provided legal counsel to, all three companies.  See id., Exhibit 69.  He provided legal advice to hospital staff and administration, reviewed legal documents when requested to do so, and conducted medical malpractice prevention seminars at all Winward facilities.  See id.  He was aware of the corporate financial problems in 1997.  See id.

Pennywell has a bachelors degree in psychology and a masters degree in education, both from Southern University, and has received a Ph.D. in psychological statistics from University of North Texas.  See id., Exhibit 71.  He invested $250,000 in Winward Institute and Mynex.  He served as vice president for human resources for the three companies.  See id.  He was aware of the financial problems of the companies in 1997, but did not participate in any negotiations with the IRS regarding the outstanding trust fund taxes.  See id.

Williams earned his bachelor of science degree in chemistry from Southern University in 1971. See id., Exhibit 72. He served as Treasurer of each of the three companies and assisted the therapy department by personally taking part in recruiting therapists, and interviewing them. He had approximately $300,000 invested in the companies. See id.

Mynex's management division performed the accounting functions, including payroll services and check writing functions, for all three of the businesses at issue. See id., Exhibit 77. Stevens' department had financial reporting duties, including management reports, including preparation of financial statements, preparation of payroll tax returns and cost reports and weekly internal financial reports. See id., Exhibits 72, 73, 77. His department also made bank deposits and produced payroll checks. See id. He never had any authority to sign any checks on behalf of any corporate entity. See Record Document 72, Exhibits 501, 502. He never owned any stock in any corporate entity at issue in these proceedings. See Record Document 72-2 at 2.

## PROCEDURAL BACKGROUND

Davis, Singleton, Williams, Pennywell, and Stevens were assessed for the trust fund portion of payroll taxes withheld from the wages of employees of Winward Institute, Winward Healthcare, and Mynex. See Record Document 62, Exhibits 66, 68. The trust fund portion of payroll taxes withheld from the wages of the employees claimed by the IRS pertaining to the Winward Institute are for the third quarter 1996; second quarter 1997; third quarter 1997; fourth quarter 1997; first quarter 1998; second quarter 1998. The trust fund taxes claimed by the IRS pertaining to Winward Healthcare are for the third quarter 1997; fourth quarter 1997; first quarter 1998; and second quarter 1998. The trust fund

taxes claimed by the IRS pertaining to Mynex are for the first quarter 1997; second quarter 1997; third quarter 1997; fourth quarter 1997; first quarter 1998; and second quarter 1998.

Davis, Singleton, Williams, and Pennywell ("the owners") were assessed by the IRS as persons responsible for trust fund tax payments for the three companies for the quarters described above. The owners dispute these assessments. Stevens was assessed by the IRS as a responsible person for the same tax periods as the owners, except for the third quarter of 1996. Stevens also disputes the assessments.

Davis utilized the divisible tax procedure, paid under protest the amounts assessed for one employee for one quarter for each company, and then filed a claim for refund. The claim for refund was denied. On January 27, 2006, Davis filed the instant suit to recover amounts he paid toward the aforementioned federal tax liabilities. The United States counterclaimed, and also filed suit against Singleton, Pennywell, Williams, and Stevens, for the full amounts assessed, plus interest and penalties. All of the counterclaim defendants deny liability for any amounts claimed by the IRS.

On June 30, 2008, the United States filed a Motion for Summary Judgment, seeking a judgment imposing liability against the counterclaim defendants, specifically Davis in the mount of $3,152,862.85; Singleton in the amount of $3,152,757.49; Pennywell in the amount of $3,152,438.07; Williams in the amount of $3,152,757.77; and Stevens in the amount of $3,406,313.64. See Record Document 62. The United States acknowledged that under longstanding administrative practice, the total amount of the unpaid taxes is collected only once. See id. at 4 n. 2.[2] The counterclaim defendants have opposed the

--------------------------------------------------------

[2]Responsible persons who act willfully in failing to ensure the payment of taxes and are assessed under Section 6672 "are jointly and severally liable." Mazo v. U.S., 591 F.2d

Motion for Summary Judgment.  <u>See</u> Record Documents 72 & 74.

**LAW AND ANALYSIS**

**I.      Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Stahl v. Novartis Pharm. Corp.</u>, 283 F.3d 254, 263 (5th Cir. 2002).  If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." <u>Littlefield v. Forney Indep. Sch. Dist.</u>, 268 F.3d 275, 282 (5th Cir. 2001).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  <u>See</u> <u>Alton v. Tex. A&M Univ.</u>, 168 F.3d 196, 199 (5th Cir. 1999).

**II.     Section 6672(a) Liability.**

The Internal Revenue Code requires employers to withhold federal income tax and social security taxes from their employees' wages.  <u>See</u> <u>Howard v. U.S.</u>, 711 F.2d 729, 733

---

1151, 1157 (5th Cir. 1979).

(5th Cir. 1983), citing 26 U.S.C. §§ 3102, 3402.  The withholdings are held in a special trust fund for the United States.  See Howard, 711 F.2d at 733.  Each employee is considered to have paid the taxes to the United States even if their employer does not remit the funds to the Government.  See id.; Wood v. U.S., 808 F.2d 411, 414 (5th Cir. 1987).  When a corporate employer neglects to pay the required taxes, Section 6672(a) of the Internal Revenue Code authorizes the Government to assess the full amount of taxes due against the corporation's responsible officers in the form of a penalty.  See Howard, 711 F.2d at 733; 26 U.S.C. § 6672(a).  Section 6672(a) provides, in pertinent part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).  Section 6672(a) imposes two specific requirements for liability: a "responsible person" who acted "willfully" in not paying the taxes.  See Wood, 808 F.2d at 414.

## A.    Burden of Proof.

It is well settled in tax dispute cases that an assessment is entitled to a legal presumption of correctness.  See U.S. v. Fior D'Italia, Inc., 536 U.S. 238, 242, 122 S.Ct. 2117, 2122 (2002).  The tax deficiency is presumptively correct under this rationale, unless there is a finding that the computational methods used, and therefore the assessment, were arbitrary and without foundation.  See Olster v. Comm'r of I.R.S., 751 F.2d 1168, 1174 (11th Cir. 1985).  The taxpayer bears the burden of proving that the computational methods used were arbitrary and without foundation.  See id., citing Mersel v. U.S., 420

F.2d 517 (5th Cir.1970). Thus, in Section 6672(a) cases, "once the Government offers an assessment into evidence, the burden of proof is on the taxpayer to disprove his responsible-person status or willfulness." Barnett v. I.R.S., 988 F.2d 1449, 1453 (5th Cir. 1993).

Here, the United States has submitted certificates of assessments and payments regarding each of the counterclaim defendants' responsible person liabilities. See Record Document 62, Exhibits 68-1 through 68-35. These assessments are part of the summary judgment record. Notwithstanding, the counterclaim defendants challenge the correctness of the assessments made against them on two grounds: (1) a financing agreement with Daiwa Financial Services; and (2) IRS Case History Notes.

The counterclaim defendants argue that there can be no outstanding payroll tax liabilities for any time period prior to March or April 1997, the time frame in which the three companies allegedly entered into a financing agreement with Daiwa. According to the counterclaim defendants, Daiwa required the three companies to pay their outstanding payroll tax obligations as a condition of its providing financing, and, because Daiwa ultimately provided financing, the taxes must have been paid. However, this argument is legally flawed, as the counterclaim defendants failed to submit a copy of the financing agreement as part of the summary judgment record. Their assertion, without more, is hearsay and not the competent summary judgment evidence needed to sustain their burden of proving that the computational methods used in this case were arbitrary and without foundation.

The counterclaim defendants also rely on narrow, selected excerpts from the IRS case history notes to defeat the legal presumption of correctness. First, they point to

various case history notes relating to Winward Institute. The first notation states that the case was opened on December 7, 1996 and then another states that the case was closed on May 16, 1997. The counterclaim defendants argue that these notations conclusively prove that no tax liability existed for any of the three entities prior to March or April 1997. This argument appears to be somewhat of a legal stretch; its persuasiveness is further lessened by a subsequent notation that the case was reopened.

The counterclaim defendants also challenge the assessments based on other general history notations relating to Winward Institute and Mynex, specifically a May 2000 general history note stating:

> List of things to consider in investigation of this and related case Winward Healthcare and Mynex.
>
> 1.    Resolve credit balances on TDI tax periods 01-09/30/1998 and 12/31/1998, for both Winward Institute and Mynex.

Record Document 74, Exhibit 259 at 0306. This notation is insufficient to rebut the legal presumption of correctness, as it appears to simply be part of a "to do list" to continue the investigation of the tax delinquencies of the three companies and there is no record evidence that there were, in fact, credit balances. Moreover, the IRS did not assess responsible person liabilities regarding Winward Institute's third and fourth quarters of 1998 and Mynex's fourth quarter of 1998. The counterclaim defendants further rely on other notations referencing mere recommendations and notes to the effect that one of the three companies was staying current with tax deposits. In the context of the case notes as a whole, these isolated notations simply do not establish that the IRS's computational methods were arbitrary and without foundation. Thus, the burden of disproving their responsible-person status and/or willfulness remains with the counterclaim defendants.

**B.     Responsible Person(s).**

The Fifth Circuit generally takes a broad view of who qualifies as a responsible person under Section 6672(a).  See Barnett, 988 F.2d at 1454.  Responsibility is determined by one's status, duty, and authority.  See id.; Wood, 808 F.2d at 415. Responsibility does not require knowledge that one has that duty and authority to withhold and pay taxes.  See Barnett, 988 F.2d at 1454.  "The crucial inquiry is whether the person had the 'effective power' to pay the taxes – that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed."  Id.  In fact, a person may qualify as a responsible person even if he did not know that withholding taxes have not been paid.  See id.  Likewise, a person does not cease to be a responsible person merely by delegating the responsibility to others.  See id. at 1454-1455.  Section 6672(a) further extends to "any" responsible persons, not simply to the person most responsible for the payment of the taxes.  See id. at 1455.  Typically, there are multiple responsible persons in any company.  See id.  The ultimate determination "is whether a [person], by virtue of his position in . . . the company, could have had 'substantial' input into [withholding and paying employees' taxes and paying creditors], had he wished to exert his authority."  Id.

In a case where a person lacks the precise responsibility of withholding or paying employees' taxes, the Fifth Circuit has looked to a number of circumstantial indicia of responsible person status.  See id.  These factors include whether the person:

(I)      is an officer or member of the board of directors;

(ii)     owns a substantial amount of stock in the company;

(iii)    manages the day-to-day operations of the business;

(iv)     has the authority to hire or fire employees;

(v)      makes decisions as to the disbursement of funds and payment of creditors; and

(vi)     possesses the authority to sign company checks.

Id.  No single factor is dispositive of the issue.  See id.

Singleton, Davis, Pennywell, and Williams were all founders, equal 25% owners, officers, and directors in each of the three companies during the periods the trust fund taxes were not fully paid.  Singleton, a practicing attorney, was the Chief Executive Officer and Chairman of the Board.  See Record Document 62, Exhibit 70 at 79.  He attended weekly meetings with hospital management and was involved in corporate policy making.  See id. at 49-53.  He was also an active participant and organizer of meetings to address company problems.  See id. at 147-149.  Singleton testified in his deposition that he would receive the financial reports of the companies.  See id. at 52-53.  He was involved in the day-to-day operations of the companies, including hiring and firing of employees.  See Record Document 62, Exhibit 77 at 4.  Singleton visited a Winward facility every day and his law office was located in the same building as the Winward corporate offices.  See Record Document 62, Exhibit 70 at 31.  He had the authority to sign checks for all three companies and testified in his deposition that the accounting staff would routinely bring him checks to sign and that whatever they brought to him, he would sign.  See id. at 57-58.  Singleton further testified that he had the authority to refuse to sign a check.  See id. at 102.

Davis, also a practicing attorney, provided legal counsel to the three companies, specifically rendering legal guidance to staff and administration, reviewing legal

documents, and conducting medical malpractice prevention seminars at all facilities.  See Record Document 62, Exhibit 69 at 47-48.  Davis testified in his deposition that he was involved in personnel issues and, as a member of the Board, had the ability to recommend the firing of employees.  See id. at 36-37, 48.  He further testified that he considered himself to be a "very active" participant in the companies, visiting the Winward facilities at least three times a week and attending the weekly meetings with staff and other board members.  See id. at 50, 52, 136.  Davis had the authority to deal with major suppliers and customers; negotiate corporate contracts and loans; open and close corporate bank accounts; sign/countersign corporate checks; and guarantee/co-sign corporate bank loans. See Record Document 62, Exhibit 39 at 0179.  He was also authorized to sign on all checking accounts for the three companies and routinely signed the checks presented to him by the accounting department.  See Record Document 62, Exhibits 7-9, 69 at 38.

Pennywell, who holds a Ph.D. in psychology, served as Senior Vice President for Human Resources for the three companies.  See Record Document 62, Exhibits 6 at 0633, 71 at 7.  He had the authority to deal with major suppliers and customers; negotiate corporate contracts and loans; open and close corporate bank accounts; sign/countersign corporate checks; and guarantee/co-sign corporate bank loans.  See Record Document 62, Exhibit 37 at 1503.  Pennywell testified in his deposition that he tried to attend the weekly meetings with staff and other board members.  See Record Document 62, Exhibit 71 at 29-29.  He further testified that he worked closely with the human resources staff, addressed concerns in the benefits and patient relations areas, spent time with patients to monitor patient care, helped to ensure compliance with personnel policies, and worked with community relations.  See id. at 14-15, 21-22, 66.  He could and did sign checks for

all three companies, but stated that he never refused to sign a check. <u>See id.</u> at 24, 28.

Williams served as Senior Vice President and Treasurer of each of the companies. <u>See</u> Record Document 62, Exhibits 6 at 0633, 72 at 13-14. As a board member, he had the authority to sign checks on behalf of the three companies and was authorized to sign checks on all checking accounts held by the three companies. <u>See</u> Record Document 62, Exhibit 72 at 26, 90-91. Williams testified in his deposition that approximately once or twice a week, he attended meetings with some combination of the board members to discuss facility business. <u>See</u> Record Document 62, Exhibit 72 at 28-29. He also testified that he was involved in the day-to-day business of the companies. <u>See id.</u> at 42-44. He was active in recruiting therapists, monitored the therapy department, and addressed any concerns raised in the therapy department. <u>See id.</u> at 12-13, 18, 33-34, 42-44. As a board member, Williams also had the authority to hire and fire employees. <u>See id.</u> at 47-48. Williams also had the authority to manage employees; sign/countersign corporate checks; guarantee/co-sign corporate bank loans; and authorize payroll checks. <u>See</u> Record Document 62, Exhibit 28 at 4097.

None of the owners can dispute that he was an officer, board member, and equal shareholder of each of the three companies during the relevant time periods. The owners also can not contest that they had the authority to, and did, sign checks on behalf of all of the companies. They were each intimately involved in running the companies. However, the owners seem to contend that because they hired others to run the businesses' financial department, they can not be held responsible for the failure to pay the withholding taxes at issue. This argument fails, as there is no dispute that their sweeping authority over the businesses extended to financial matters, regardless of whether they exercised that

authority and/or hired individuals, such as Reid and Stevens, to oversee the financial department.

This Court must consider whether the owners, by virtue of their positions in the companies, could have had substantial input into decisions relating to the payment of payroll taxes, had they wished to exert their authority. See Barnett, 988 F.2d at 1455. The summary judgment record establishes that they could have exercised control over the businesses' finances, including the payment of payroll taxes, any time they wanted. They had the authority to, and did, sign all of the checks for the three companies. Regardless of whether Reid or Stevens prepared the checks, there is no record evidence indicating that any two owners could not have written a check to pay a creditor or simply instructed Reid or Stevens to do so. Further, the owners' argument that, after they learned of the payroll tax deficiencies, they told Stevens to take the appropriate steps to rectify the situation also fails. The delegation to another of the authority to see that payroll taxes are paid does not allow a responsible person to escape liability under Section 6672(a). See Mazo, 591 F.2d at 1155. Based on the foregoing, the Court finds, as a matter of law, that Singleton, Davis, Pennywell, and Williams are all persons responsible for collecting, truthfully accounting for, and paying over the payroll taxes in question. The Court will now consider whether Stevens is also a responsible person under Section 6672(a).

Stevens argues that he was not a responsible person for purposes of Section 6672(a). First, he maintains that he never owned stock in any of the three corporate entities and he could not sign company checks or effect bank transactions. See Record Document 72-3 at 4. He further contends that he could not make any decisions as to the disbursement of funds, the prioritization of disbursements, or the payment of creditors.

See id. at 6.  Stevens also asserts that he could not fire employees and that his ability to

hire extended only to the accounting manager and his secretary.  See id.  Stevens appears

to argue that he was not a responsible person because Reid, who was his superior, was

the individual in charge of all of the operations of the corporate entities.  See id. at 8.

Even accepting all of Stevens' arguments as true, the Court finds the he was a

responsible person for purposes of Section 6672(a).  Stevens was formally hired by Mynex,

but served as Vice President of Finance for all three companies.  There is no dispute that

Stevens supervised the accounting department, oversaw the preparation of all checks,

prepared and signed quarterly employment tax returns on behalf of all three companies,

and acted as the corporate representative to outside CPAs, Medicare, and the IRS.  The

preparation of checks extended to all financial obligations, including payroll and any checks

to pay federal tax deposits.  The key issue is whether Stevens, by virtue of his position,

could have had substantial input into decisions relating to the payment of the trust fund

taxes and the payment of other creditors, had he wished to exert his authority.  See

Barnett, 988 F.2d at 1455.  Here, undisputed evidence establishes that the owners signed

all checks presented to them.  Stevens could have easily directed the accounting

department to draft checks to the IRS instead of other creditors.  Stevens' argument that

he had no power to fire and that his hiring ability was limited to the selection of an

accounting manager and his secretary does not conflict with his qualification as a

responsible person, as limited hiring ability does not relieve him of his responsibility to

make certain that the trust fund taxes were being paid.  See Frey v. U.S., No. 99-0831,

2001 WL 493136, *4 (N.D.Tex. May 4, 2001) (reasoning that evidence relating to the

authority to hire and fire employees and to participate in such  decisions does not create

a genuine issue of material fact on the issue of whether an individual is a responsible person). The Frey court also noted that "authority to make employment decisions within the accounting department, even if not unilateral, would only permit a reasonable trier of fact to find that she did exercise significant control over [the company's] operations." Id. The Court finds, as a matter of law, that Stevens was a person responsible for collecting, truthfully accounting for, and paying over the payroll taxes in question.

### C. Willfulness.

Because Section 6672(a) imposes liability on a responsible person only if that person "willfully" failed to collect, account for, or pay over withheld taxes, the willfulness inquiry is often the sifter in Section 6672 cases. See id. at 1457. In the context of Section 6672(a), willfulness does not require a bad motive or evil intent, but merely a voluntary, conscious, and intentional act. See Wood, 808 F.2d at 415, citing Mazo v. U.S., 591 F.2d 1151, 1154 (5th Cir. 1979). In Mazo, the Fifth Circuit acknowledged that the willfulness inquiry "is necessarily directed to the state of the responsible person's mind, a subjective determination" that is usually factual and may preclude summary judgment. Mazo, 591 F.2d at 1157. Yet, the court concluded that "evidence that the responsible person had knowledge of payments to other creditors after he was aware of the failure to pay withholding tax is sufficient for summary judgment on the question of willfulness." Id. Further, a responsible person acts willfully when he proceeds with reckless disregard of known or obvious risks that trust funds may not be remitted to the government. See Wood, 808 F.2d at 415; Mazo, 591 F.2d at 1155. Examples of such reckless disregard include "failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." Mazo, 591 F.2d at 1155.

Singleton, Davis, Pennywell, and Williams contend that they did not act willfully because after learning of the tax liabilities in the fall of 1997, they took all reasonable efforts to see that the taxes were paid. They contend that they established a system of checks and balances as to Stevens' actions; called an emergency board meeting in November 1997; and instructed Reid and Stevens to undertake a course of action to ensure the timely payment of all employee tax obligations. Stevens was specifically instructed to contact the IRS and, according to the owners, he later reported back to them that he had worked out an installment agreement with the IRS and the IRS would allow the three entities to continue to operate. The owners also contend that Stevens was directed to pay the IRS in preference to any other creditor.

Even if the Court assumes that Stevens assured the owners that he was taking care of the outstanding taxes, they can not avoid liability. In <u>Mazo</u>, the Fifth Circuit reasoned:

> In essence the appellants' primary argument is that an issue was created with respect to willfulness by their contention that Lavoie, the controller, misled them by asserting that he had taken care of the matter or would take care of the matter for them. However, once they were aware of the liability to the government, they were under a duty to ensure that the taxes were paid before any payments were made to other creditors. If, after receiving actual notice, corporate officials could once again delegate their responsibility to subordinates, then repeated escape from liability would be possible and the government would be required to monitor corporate affairs daily. The statutory concept of willfulness conveys no such meaning.

<u>Mazo</u>, 591 F.2d at 1157. Here, the owners became aware of the tax liability in the fall of 1997. Yet, even after this date, the three companies continued to make payroll and make at least partial payments to other creditors while the delinquent taxes were accruing. <u>See</u> Record Document 62, Exhibits 28 at 4100, 29 at 4051, 30 at 0128. When presented with company checks to sign, the owners did not scrutinize the checks and ensure that federal

tax deposit checks were being signed in preference to payroll and checks to other creditors. At a minimum, the owners exhibited reckless disregard in failing to investigate and ensure that Stevens was, in fact, handling the tax delinquencies.

The owners also argue that a finding of willfulness is precluded because they had no ability to pay Winward Institute's withholding tax obligations after its involuntary bankruptcy proceeding was instituted in March 1998. In May 1998, the Bankruptcy Court approved Winward Institute's application to operate as a debtor-in-possession, which continued until July 21, 1998, when a Chapter 11 trustee was appointed. Yet, on June 26, 1998, prior to the appointment of a trustee, Winward Institute moved the Bankruptcy Court for authority to compensate Stevens. This filing negates the owners' contention that the filing of the bankruptcy stripped them of control and authority, as no trustee was in place and Winward Institute could not have been running itself at this time. At this point, the owners could have petitioned the Bankruptcy Court for specific approval to pay the taxes due in lieu of seeking permission to compensate Stevens. Thus, the owners remained responsible and willfully failed to pay Winward Institute's withholding taxes, despite the bankruptcy.[3]

---

[3]Such finding is supported by Cook v. U.S., 52 Fed. Cl. 62 (Fed. Cl. 2002), which provided persuasive guidance to the Court. In Cook, a controlling shareholder and president of a business qualified as a responsible person. See id. In light of the business' bankruptcy, he challenged the willfulness requirement, arguing that bankruptcy judge effectively compelled him not to pay any other expenses including the company's trust fund tax obligations. See id. at 71. The court disagreed, reasoning "while the bankruptcy court, on several occasions, acceded to requests made by [the responsible person] to authorize particular expenditures, . . . neither [the responsible person] nor his attorneys, during formal hearings or informal conferences, . . . sought . . . leave to make those payments." Id. at 71-72.

The owners also argue that the three businesses had insufficient funds to pay the withholding taxes by the time they learned of the deficiencies. This argument fails as a matter of law. It is uncontested that the financial/accounting department continued to prepare checks for other creditors and that the owners continued to sign such checks after all of the counterclaim defendants knew about the tax deficiencies. The three businesses also continued to make payroll during the periods in which the withholding taxes were accruing. If there were funds available to pay other creditors and payroll, then there were unencumbered funds available to pay the tax obligations to the IRS.

Based on the foregoing analysis, the summary judgment record establishes that the owners, Singleton, Davis, Pennywell, and Williams, willfully failed to pay the three businesses' withholding tax obligations as a matter of law. The Court will now consider whether Stevens willfully failed to pay the withholding tax obligations.

Stevens argues that he did not act willfully because once he discovered the tax delinquencies in the fall of 1997, he immediately reported them to Reid, his supervisor. See Record Document 72-3 at 12. Stevens contends that he had no way of knowing whether Reid followed up on the tax delinquencies. See id. Further, he asserts that he followed the Board's directions and contacted the IRS to work out am installment plan. See id. He maintains that his reliance on this plan precludes a finding of willfulness. See id.

The Court disagrees. Stevens has failed to present a copy of any alleged installment agreement. Further, even if there was an installment agreement, the existence of such an agreement would not preclude the Government from pursuing its rights under Section 6672(a). See Looney v. U.S., 544 F.Supp.2d 574, 581 (S.D.Tex. 2008), citing

Cash v. U.S., 961 F.2d 562, 565 (5th Cir. 1992) ("Under well established law, the liability of a responsible person under § 6672 is independent of the corporation's duty to pay trust fund taxes.").[4]  Moreover, Stevens has failed to come forward with competent summary judgment evidence disputing the fact that he supervised the preparation of checks after he knew the trust fund taxes were not being paid.  He also knew that each of the owners were continuing to sign checks made payable to other creditors after they knew the trust fund taxes were not being paid.  Willfulness is established, as Stevens, a responsible person, had knowledge of payments to other creditors after he was aware of the failure to pay the trust fund taxes.  See Mazo, 591 F.2d at 1157.

## CONCLUSION

Based on the foregoing analysis, the Motion for Summary Judgment (Record Document 62) filed by the United States is **GRANTED**.  Accordingly, Davis' complaint is **DISMISSED WITH PREJUDICE** and, pursuant to Section 6672, the counterclaim defendants are jointly and severally indebted to the United States as follows:  Davis in the amount of $3,152,652.85; Singleton in the amount of $3,152,757.49; Pennywell in the amount of $3,152,438.07; Williams in the amount of $3,152,757.77; Stevens in the amount of $3,406,313.64.  The counterclaim defendants are also jointly and severally liable for further interest and statutory additions as provided by law from June 30, 2008.

---

[4]The other counterclaim defendants similarly argued that a finding of willfulness was precluded due to the purported installment agreement.  Yet, none of the counterclaim defendants presented a copy of any alleged installment agreement and seem to rely exclusively on IRS history notes that indicate that the IRS was simply considering a proposed installment agreement.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 7th day of October, 2008.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE